## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

THOMAS E. PENNINGTON              :

                    Plaintiff,            :
                                                    Case No. 3:08CV00343
    vs.                           :
                                                    District Judge Thomas M. Rose
MICHAEL J. ASTRUE,                :      Magistrate Judge Sharon L. Ovington
          Commissioner of the Social
          Security Administration,        :

                    Defendant.            :

═══════════════════════════════════════════

## REPORT AND RECOMMENDATIONS[1]

═══════════════════════════════════════════

## I.      INTRODUCTION

Plaintiff Thomas E. Pennington suffers from various medical problems, including

chronic obstructive pulmonary disease ["C.O.P.D."], bullous emphysema, interstitial

fibrosis (Tr. 157), depression and anxiety.  (Tr. 25)  By 2003, his medical problems

interfered with his ability to perform his job as a concrete finisher, and he consequently

sought financial assistance from the Social Security Administration by applying for

Disability Insurance Benefits ["DIB"] on June 18, 2003.  He subsequently filed an

_____

[1]Attached hereto is NOTICE to the parties regarding objections to this Report and
Recommendations.

application for Supplemental Security Income ["SSI"] on March 10, 2004. In both applications he asserted that he has been under a disability since January 15, 2003. (Tr. 139-41; 469-73).

Through two rounds of administrative proceedings, Plaintiff has been unable to convince the Social Security Administration that he is disabled. He therefore brings the present case challenging the most recent administrative denial of his applications.

This case is before the Court upon Plaintiff's Statement of Specific Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #11), the administrative record, and the record as a whole.

Plaintiff seeks an Order reversing the Commissioner's denial of his DIB and SSI applications and a judicial award of benefits, or at a minimum, an Order vacating the Commissioner's denial and remanding for further administrative proceedings. The Commissioner seeks an Order affirming the denial of Plaintiff's DIB and SSI applications.

## II.    PROCEDURAL BACKGROUND

During a first round of proceedings, Plaintiff's DIB and SSI applications were denied in a November 9, 2005 decision by Administration Law Judge ["ALJ"] James I.K. Knapp. The ALJ based his denial of Plaintiff's applications on his conclusion that Plaintiff was not under a "disability" as defined by the Social Security Act. (Tr. 57-72).

Plaintiff challenged ALJ Knapp's initial denial decision by requesting review by the Appeals Council. On June 28, 2006, the Appeals Council granted Plaintiff's request

for review and found "that the residual functional capacity as found in the hearing decision should be clarified." (Tr. 48-49). The Appeals Council remanded the claim for further consideration of the evidence, an update of the medical record, and an opportunity for Plaintiff to have another hearing. (*Id.*).

On remand, ALJ Knapp held a second hearing (Tr. 518-531), and later issued his second decision, again denying Plaintiff's DIB and SSI applications on the ground that Plaintiff was not under a disability. (Tr. 25-42). The ALJ's non-disability determination and the resulting denial of benefits became the final decision of the Social Security Administration when the Appeal Council denied review on July 31, 2008. (Tr. 7-9). Such final decisions are subject to judicial review, *see* 42 U.S.C.§ 405(g), which Plaintiff now is due.

## III. ADDITIONAL BACKGROUND

At the time of the ALJ's decision, Plaintiff's age (52) placed him in the category of "closely approaching advanced age" for purposes of resolving his DIB and SSI applications. *See* 20 C.F.R. §§404.1563(d); 416.963(d).[2] (Tr. 41, 139). Plaintiff has a "limited" education, attending high school only through the 10th grade. *See* 20 C.F.R. § 416.964(b)(3). (Tr. 163).

During the May 9, 2005 hearing, Plaintiff testified that he was able to walk a half a block before having to stop to rest due to shortness of breath. (Tr. 486). He used a

---

[2] The remaining citations will identify the pertinent SSI Regulations with full knowledge of the corresponding DIB Regulations.

breathing machine up to two to three times daily. Plaintiff stated that he was able to stand up in one place for about a half-hour at a time. (Tr. 492). Plaintiff also stated that he had no difficulties sitting. (*Id.*). Plaintiff further testified that he could lift or carry 10 pounds without getting short of breath. (*Id.*).

Plaintiff testified that he suffered from depression and anxiety. He took medication, Ativan and Prozac, but did not see a psychiatrist or psychologist. (Tr. 488). Plaintiff stated that his anxiety made him nervous and his depression caused him to sit and cry for no reason. (*Id.*).

As to his daily activities, Plaintiff stated that he would wash dishes, vacuum, do laundry and perform other housework on good days. (Tr. 489). On bad days, he slept or watched television. (*Id.*). Plaintiff stated that he also went shopping, cut the grass with a push mower, watched sports and visited friends. (Tr. 491-92).

During the October 10, 2006 hearing, Plaintiff testified that he had worked part time vacuuming floors at a store since the prior administrative hearing. (Tr. 522-23). He worked three hours a week for a period of three weeks, but lost that job when the store owner's son returned from school. (Tr. 525). Plaintiff testified that his condition had changed since the prior hearing in that he no longer was as depressed as before, having started going to church and been "saved." (Tr. 523). He denied any improvement, however, as to his physical condition with regard to breathing problems. (Tr. 524, 526-27).

Turning to the remaining information in the administrative record, the most significant evidence for purposes of the present case consists of Plaintiff's medical records and the opinions of several medical sources, as follows:

John J. Peterangelo, D.O. The record reveals that Dr. Peterangelo was Plaintiff's primary care physician from at least 1987 through 2003. (Tr. 402; *see* Doc. #8 at 8). Dr. Peterangelo treated Plaintiff regularly for migraine headaches, bronchitis exacerbations and chronic allergic contact dermatitis. (*See* Tr. 298-400). In January 2002, Plaintiff began experiencing frequent shortness of breath with lung pain. Dr. Peterangelo noted a coarse cough and rhonchi, and treated Plaintiff for chronic bronchitis. (Tr. 297-98). In February 2002, a pulmonary function study revealed mild obstructive airway disease with reversible component. (Tr. 294-95). An arterial blood gas test could not be done, as Plaintiff had "difficulty doing testing procedures due to coughing and fatigue." (Tr. 295).

Examinations during early 2002 showed decreased breath sounds and expiratory wheezing. (Tr. 289, 291, 296). Dr. Peterangelo attributed Plaintiff's symptoms to an exacerbation of his C.O.P.D. (Tr. 291).

A May 2002 chest x-ray showed interstitial fibrosis in both lobes and "a bullous in the right upper lobe which has increased in size." (Tr. 284). Dominic Gaziano, M.D., F.C.C.P., reviewed the May 2002 chest film and opined that the "x-ray findings [are] compatible with rounded opacities in all lung zones," attributable "to silicosis that [Plaintiff] acquired through his occupational exposure." (Tr. 409).

In April 2003, Dr. Peterangelo wrote a letter asking Dr. Rubio to "back me on having [Plaintiff] apply for social security disability." (Tr. 290). Dr. Peterangelo stated:

> As hard as he tries, he no longer is able to physically perform the duties required [of] him at work. He has developed significant dyspnea on exertion. My impression is that [he] is now disabled and no longer able to work as a laborer. Unfortunately, he has no education beyond high school and has no other training.

(Tr. 290).

Dr. Peterangelo continued to treat Plaintiff though the end of 2003. (Tr. 270-88, 411-15). Treatment notes reveal that Plaintiff had C.O.P.D. exacerbations, recurrent bronchitis, episodic back pain, headaches and rashes on the hands and knees. (Tr. 274, 277, 279-82). Dr. Peterangelo regularly noted bronchospasms, rhonchi and decreased breath sounds. (Tr. 273, 274, 277, 280, 411).

Chest x-rays taken in October 2003 showed C.O.P.D. and a "discrete bleb formation" about five centimeters in diameter in the right upper lobe, and were suspicious for "multiple, small blebs" of the left upper lobe. (Tr. 271).

Felipe A. Rubio, M.D. Dr. Rubio, a pulmonologist, initially examined Plaintiff in July 2002. Plaintiff had shortness of breath upon exertion and exacerbated by weather, a regular cough, weakness and a decreased appetite. (Tr. 224-25). Upon examination, his respiratory rate was 12 and his lungs had "some scattered rhonchi and a few wheezes." (Id.). Dr. Rubio diagnosed moderate to severe C.O.P.D. and granulomatous disease, probably inflammatory. A chest CT on July 31, 2002 showed bilateral pan lobular

emphysematous changes, right more than left. Specifically, "extensive peripheral small low-density areas consistent with emphysematous changes," and a larger "blood-like" formation were found. (Tr. 223). A second pulmonary function study from August 2002 was consistent with mild obstructive pulmonary disease. Lung volumes indicated hyperinflation. (Tr. 219-20). Dr. Rubio advised Plaintiff that he needed to quit smoking. (Tr. 217, 225). According to Plaintiff, he followed that advice. (Doc. #8 at 6; *see* Tr. 169).

In June 2003, Plaintiff continued to have "terrible problems with dyspnea on exertion," despite use of bronchodilators (inhalers and nebulizers). (Tr. 212-13). Plaintiff's oxygen saturation was 85 percent, he was short of breath at rest, and his "lungs showed scattered wheezes and rhonchi." (*Id.*). Dr. Rubio diagnosed mild to moderate C.O.P.D., pneumoconiosis, dyspnea on exertion, and marked recurrent broncho spasm and sputum production. (*Id.*). A CT scan from June 13, 2003 revealed evidence of bullous emphysema, but did not reveal any significant interstitial pulmonary fibrosis. (Tr. 211). Dr. Rubio decided to intensify the treatment of Plaintiff's C.O.P.D. and prescribed Singulair and Uniphyl medication tablets. (Tr. 212-15). Opining that Plaintiff seemed unable to maintain meaningful employment, Dr. Rubio stated that he would support the notion of 100 percent disability for Plaintiff. (Tr. 213).

In July 2003, Dr. Rubio completed a questionnaire for the Ohio Bureau of Disability Determination ["BDD"] and reported that the severity of Plaintiff's symptoms

was consistent with his physical findings.  (Tr. 208-09).  Plaintiff continued to follow up

with Dr. Rubio.  (Tr. 436-37, 449-51, 456).

In January 2004, Dr. Rubio completed a basic medical form for the county welfare

agency in which his working diagnoses included bullous emphysema, shortness of breath

upon exertion and old granulomatous disease.  (Tr. 445-46).  Dr. Rubio opined that

Plaintiff could stand or walk for one to two hours in an eight-hour workday, sit for one to

two hours in an eight-hour workday, and lift and carry 10 pounds frequently and up to

five pounds occasionally.[3]  (Tr. 446).  Dr. Rubio opined that Plaintiff was markedly

limited in pushing/pulling, bending, reaching, handling and performing repetitive foot

movements.  (*Id.*).  Dr. Rubio thought that Plaintiff was unemployable for at least 12

months.  He concluded that Plaintiff was unemployable due to his moderate to severe

respiratory problems.  (*Id.*).

In February 2004, Plaintiff underwent an exercise treadmill stress test.  (Tr. 449-

50).  The physicians who administered the test and prepared the results reported an

"[e]lectrocally negative Adenosine stress test by EKG criteria" (Tr. 449)  and a "[n]ormal

myocardial profusion rest/stress study."  (Tr. 450).

In July 2004, pulmonary function studies revealed minimal obstruction in

Plaintiff's small airways.  (Tr. 437).  Dr. Rubio noted that Plaintiff's lung volumes, lung

_____

[3]The Court recognizes that an assessment allowing Plaintiff to lift the heavier weight (10
lbs.) more often than the lighter weight (5 lbs.) is counter-intuitive, but this recitation  accurately
reflects the boxes checked on Dr. Rubio's January 2004 report.  (*See* Tr. 446).  It is assumed that
those numbers mistakenly were reversed in that report; regardless, this detail had no effect on
the decision here.

diffusion capacity and airway resistance were within normal limits. (*Id.*). The Forced Vital Capacity ["FVC"] and Forced Expiratory Volume ["FEV"] readings were 94 percent and 112 percent, respectively, of the predicted value prior to using a bronchodilator. (Tr. 436).

In November 2004, Dr. Rubio opined that Plaintiff could lift and/or carry 10 pounds occasionally and five pounds frequently, stand and/or walk less than two hours in an eight-hour workday, and sit for eight hours in an eight-hour workday. (Tr. 419-27). Plaintiff's ability to sit was not affected by his impairment. Dr. Rubio further opined that Plaintiff never could climb or crawl, but occasionally could stoop, crouch and kneel. (Tr. 425). Dr. Rubio noted that exposure to heights, chemicals, temperature extremes, vibration, dust, fumes and humidity should be restricted, as they "can trigger the respiratory trac[t]." (Tr. 426). In conclusion, Dr. Rubio felt that Plaintiff did not have the residual functional capacity to perform even sedentary work on a sustained basis. (Tr. 427).

Damian M. Danopulos, M.D. Dr. Danopulos examined Plaintiff on a consultive basis in September 2003, at the request of the Ohio BDD. (Tr. 250-64). Plaintiff complained of effort-related shortness of breath with easy tiredness, dyspnea and fatigue. (Tr. 250). Clinical examination revealed diminished breath sounds and prolonged expiration. (Tr. 253). A pulmonary function study revealed mild degree obstructive and restrictive lung disease with questionable bronchodilator effect. (Tr. 257-264a). Dr. Danopulos diagnosed Plaintiff with a history of asthma with mild to moderate degree

emphysema. (Tr. 253). Dr. Danopulos concluded that Plaintiff's "ability to do any work-related activities like walking, lifting and carrying are affected from his mild to moderate emphysema." (*Id.*).

E.S. Villanueva, M.D. Dr. Villanueva reviewed the medical record on behalf of the Ohio BDD in September 2003. (Tr. 266-69). Dr. Villanueva opined that Plaintiff could lift and/or carry 25 pounds frequently and 50 pounds occasionally, stand and/or walk for about six hours in an eight-hour workday, and sit for a total of about six hours in an eight-hour workday. (Tr. 266). Dr. Villanueva opined that Plaintiff frequently could climb ramps and stairs, but never could climb ladders, ropes or scaffolds. (Tr. 267). According to Dr. Villanueva, Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation. (Tr. 268). Dr. Villanueva stated that Plaintiff was able to do work that limited his exposure to irritants and that was less physically demanding than his past relevant work as a concrete finisher. (Tr. 269).

George O. Schulz, Ph.D. In October 2003, Dr. Schulz, a clinical psychologist, conducted a consultative psychological examination at the request of the Ohio BDD. (Tr. 228-233). Dr. Schulz reported that Plaintiff had not been treated for an emotional, behavioral or psychological problem in the past. (Tr. 229). Dr. Schulz noted that Plaintiff's appearance, behavior, speech, thought, affect and mood were normal. (Tr. 230). Dr. Schulz diagnosed an Anxiety Disorder, Not Otherwise Specified, and assigned a Global Assessment of Functioning ["GAF"] score of 65. (Tr. 231). Dr. Schulz opined that Plaintiff's ability to relate to others, including fellow workers and supervisors, was

10

minimally impaired and that Plaintiff was able to relate sufficiently to co-workers on simple and moderate repetitive tasks. (Tr. 232). Dr. Schulz further opined that Plaintiff's ability to understand, remember and follow instructions was mildly impaired, but that Plaintiff was capable of comprehending and completing simple and moderate routine tasks in a job setting. (Tr. 233). According to Dr. Schulz, Plaintiff's ability to maintain attention and concentration and to perform simple, repetitive tasks with adequate pace and persistence was minimally impaired. (*Id.*). Plaintiff's ability to withstand the stress and pressures associated with day-to-day work activity was mildly impaired by anxiety features. (*Id.*).

Dr. Schulz completed another consultative psychological evaluation in July 2005. (Tr. 458-64). At that time, Dr. Schulz believed that Plaintiff suffered from depression in addition to anxiety. Dr. Schulz diagnosed Depressive Disorder, Not Otherwise Specified, and Anxiety Disorder, Not Otherwise Specified, and assigned a GAF score of 58. (Tr. 462). Dr. Schulz opined that Plaintiff's mental ability to relate to others, including fellow workers and supervisors, to maintain attention and concentration, and to perform simple repetitive tasks were minimally impaired. (Tr. 463). Dr. Schulz also opined that Plaintiff's ability to understand, remember and follow instructions and to withstand the stress and pressures associated with day-to-day work activity were moderately impaired. (*Id.*).

Alice L. Chambly, Psy.D.  In September 2003, Dr. Chambly, a state agency reviewing psychologist, opined that Plaintiff did not have a severe mental impairment.

11

(Tr. 235-49). According to Dr. Chambly, Plaintiff's anxiety was intermittent and was controlled by medication. (Tr. 240). Dr. Chambly opined that Plaintiff had no limitations in the activities of daily living, no limitations in social functioning, and only mild limitations in concentration, persistence and pace. (Tr. 245).

Lynne Torello, M.D. In December 2003, Dr. Torello reviewed the medical record on behalf of the Ohio BDD. (Tr. 403-08). Dr. Torello opined that Plaintiff should be able to lift 20 pounds occasionally and 10 pounds frequently. Plaintiff should be able to sit, stand or walk up to six hours out of an eight-hour workday. (Tr. 404). He could climb or balance only occasionally, and concentrated exposure to extreme heat, wetness, humidity or vibration should be avoided. (Tr. 404-06). Dr. Torello afforded more weight to treating source opinions than to Dr. Danopulos, "who has seen him only for one visit." (Tr. 405, 408). Dr. Torello also opined that Plaintiff did not meet or equal a listing. (Tr. 408).

John C. Sefton, D.O. In January 2004, Plaintiff began seeing Dr. Sefton, a primary care physician, for complaints of coughing, fatigue and depression. (Tr. 428, 447). Dr. Sefton monitored Plaintiff's pulmonary condition and treated him for headache and bronchitis exacerbations. (Tr. 428-431). In March 2004, examination revealed Plaintiff had rhonchi. (Tr. 430). A July 2004 pulmonary function study revealed that "mechanics of ventilation are abnormal," consistent with minimal obstructive pulmonary disease. (Tr. 436-437). In October 2004, Dr. Sefton diagnosed anxiety and depression and prescribed Prozac. (Tr. 431).

On November 19, 2004, Dr. Sefton completed interrogatories. (Tr. 441-44). According to Dr. Sexton, Plaintiff was unable to perform adequately in most areas of work-related mental functioning. (Tr. 441-43). Dr. Sexton reported that Plaintiff was "clearly anxious and depressed," was withdrawn, and had a flat affect, poor eye contact and poor social interaction. (Tr. 443). Dr. Sefton also opined that Plaintiff generally had poor concentration and was unable to stay focused and on task. (Tr. 444).

On November 23, 2004, Dr. Sefton reported that Plaintiff appeared fatigued, requiring "a great deal of effort just to get out of the chair and onto the table for examination." (Tr. 447-48). According to Dr. Sexton, Plaintiff was "rather limited" by fatigue, and frequent absences likely would make it "difficult for [Plaintiff] to maintain an ongoing employment situation." (*Id.*). Dr. Sefton noted that Plaintiff's physical capacity was more limited by psychological factors than by physical ones. (*Id.*).

A CT of the chest taken on April 5, 2005 showed "paraseptal" emphysematous changes "with multiple peripheral blebs, especially in the apices." (Tr. 456).

On August 26, 2006, Dr. Sefton completed a second set of interrogatories. (Tr. 96-105). He opined that Plaintiff's psychological impairments magnified his physical symptoms. (Tr. 98). Dr. Sefton further opined that Plaintiff was unable to perform numerous job-related functional tasks. (Tr. 99-105). Dr. Sexton did note, however, that Plaintiff could understand, remember and carry out very simple work instructions, could relate predictably in social situations and get along with co-workers or peers, and could maintain concentration and attention for extended periods and sustain an ordinary routine

while performing simple tasks. (Tr. 100-04). Dr. Sefton opined that Plaintiff had slight restrictions of activities of daily living, moderate difficulties in maintaining social functioning, and moderate deficiencies of concentration, persistence or pace. (Tr. 104-05). Dr. Sefton also opined that Plaintiff's physical symptoms would prevent him from being prompt and regular in attendance. (Tr. 99, 102).

Paul Boyce, M.D. Dr. Boyce, the ALJ's medical expert, testified at the May 9, 2005 hearing. Dr. Boyce indicated that Plaintiff suffered from bullous emphysema, but not silicosis. (Tr. 498). Dr. Boyce testified that although pulmonary function studies in February 2002 demonstrated evidence of mild to moderate obstructive disease, subsequent pulmonary function studies reflected that Plaintiff's condition improved over time, with the most recent pulmonary function testing results being normal or nearly normal. (Tr. 499-500). Based on his analysis of the testing results, Dr. Boyce believed that Plaintiff had some environmental problems from exposure to cement while employed as a cement finisher, but that his pulmonary functioning returned to normal over the course of time once he was removed from that environment. (Tr. 500). Based on the pulmonary function studies and the cardiac evaluations, Dr. Boyce testified that he could find no objective medical basis for Plaintiff's shortness of breath upon exertion. (*Id.*). Dr. Boyce opined that Plaintiff's pulmonary impairment did not cause any exertional work-related limitations except a limitation to jobs with a clean air environment. (Tr. 500-01). Due to eczema breakouts while exposed to concrete, Plaintiff also should avoid "dealing with toxic materials with his hands unless he was gloved." (*Id.*).

14

## IV. ADMINISTRATIVE REVIEW

### A. "Disability" Defined and the Sequential Evaluation

The definition of the term "disability" is essentially the same for both DIB and SSI. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job, and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen*, 476 U.S. at 469-70 (1986). A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability. *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence. (*See* Tr. 26); *see also* 20 C.F.R. § 416.920(a)(4). Although a dispositive finding at any Step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the evaluation answers five questions:

1. Is the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set

15

forth in the Commissioner's Listing of Impairments, 20
C.F.R. Subpart P, Appendix 1?

4.    Considering the claimant's residual functional capacity, can
the claimant perform his or her past relevant work?

5.    Considering the claimant's age, education, past work
experience, and residual functional capacity, can the claimant
perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279

F.3d 348, 354 (6th Cir. 2001).

**B.    The ALJ's Decision**

At Step 1 of the sequential evaluation, the ALJ found that Plaintiff met the

insured-status requirement for DIB eligibility through December 2007.  (Tr. 40).  The

ALJ also found at Step 1 that Plaintiff had not engaged in substantial gainful activity

since January 15, 2003, his alleged date of disability.  (*Id.*).

The ALJ found at Step 2 that Plaintiff has the severe impairments of bullous

emphysema, generalized anxiety disorder and depressive disorder NOS.  (*Id.*).  The ALJ

determined at Step 3 that Plaintiff does not have an impairment or combination of

impairments that meet or equal the level of severity described in Appendix 1, Subpart P,

Regulations No. 4.  (*Id.*).

At Step 4 the ALJ concluded that Plaintiff lacks the residual functional capacity to:

(1) do any job that would expose him to temperature extremes, wet/humid areas, fumes,

smoke dust, odors or poor ventilation; (2) do any job that would expose him to increased

atmospheric pressure; (3) do any job that would expose him to caustic chemicals; (4) do

other than occasional climbing of stairs; (5) do any climbing of ladders, ropes or scaffolds; (6) carry out complex instructions; or (7) do other than low stress work activity (*i.e.*, no job involving above average pressure for production, work that is other than routine in nature, or work that is hazardous).  (Tr. 41).  The ALJ further found that Plaintiff is unable to perform his past relevant work.

Using Medical-Vocational Rule 204.00 as a framework, coupled with the vocational expert's testimony, however, the ALJ concluded that a significant number of jobs exist in the national economy that Plaintiff is capable of performing.  (*Id.*).  The ALJ's assessment of Plaintiff's residual functional capacity, along with his findings throughout the sequential evaluation, led him again to conclude that Plaintiff was not under a disability and thus not eligible for DIB or SSI.  (Tr. 25-42).

## V.    JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines:  whether substantial evidence in the administrative record supports the ALJ's factual findings and whether the ALJ "applied the correct legal criteria."  *Bowen v. Comm'r. of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

"Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.* at 746 (citing in part *Richardson v. Perales*, 402 U.S. 389, 401 (1977)).  It consists of "'more than a scintilla of evidence but less than a preponderance . . ."  *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Judicial review of the administrative record and the ALJ's decision is not *de novo*. *See Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). The required analysis is not driven by whether the Court agrees or disagrees with an ALJ's factual findings or by whether the administrative record contains evidence contrary to those findings. *Rogers*, 486 F.3d at 241; *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld "as long as they are supported by substantial evidence." *Rogers*, 486 F.3d at 241 (citing *Her*, 203 F.3d at 389-90).

The second line of judicial inquiry – reviewing the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *See Bowen*, 478 F.3d at 746. This occurs, for example, when the ALJ has failed to follow the Commissioner's "own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen*, 478 F.3d at 746 (citing in part *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 546-47 (6th Cir.2004)).

## VI.    DISCUSSION

### A.    The Parties' Contentions

Plaintiff contends that he is more limited than the ALJ found, given that three treating physicians – Drs. Peterangelo, Rubio and Sefton – found him "limited to a very limited range of sedentary work by the combination of his physical and mental impairments." (Doc. #8 at 12). He asserts that the ALJ erred in his analysis of the medical source opinions of record by accepting that of the non-examining medical expert,

Dr. Boyce, over those of the treating physicians. He also urges that the ALJ similarly erred in rejecting the opinion of Dr. Sefton, whom Plaintiff contends offered the only opinion of record to "specifically consider[ ] the impact of [Plaintiff's] mental impairments on his experience of physical symptoms." (*Id.* at 1). He asks the Court to reverse the ALJ's decision and remand for payment of benefits, or at a minimum, to remand to correct the alleged errors. (*Id.* at 19).

The Commissioner claims that the ALJ did not err, and asks that the ALJ's decision be affirmed. (Doc. #11).

### B.     Medical Source Opinions

#### 1.     *Treating Medical Sources*

Key among the standards to which an ALJ must adhere is the principle that greater deference generally is given to the opinions of treating medical sources than to the opinions of non-treating sources. *Rogers v. Commissioner of Social Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see* 20 C.F.R. § 404.1527(d)(2). This is so, the Regulations explain, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a DIB claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examiners, such as consultative examinations or brief hospitalizations . . ." 20 C.F.R. § 404.1527(d)(2); *see also Rogers*, 486 F.3d at 242. In light of this, an ALJ must apply controlling weight to a treating source's opinion when it is both well supported by medically acceptable data and not

inconsistent with other substantial evidence of record. *Rogers*, 486 F.3d at 242; *see also Wilson v. Comm'r of Social Sec*., 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(d)(2).

If either of these attributes is missing, the treating source's opinion is not deferentially due controlling weight, *Rogers*, 486 F.3d at 242; *Wilson*, 378 F.3d at 544, but the ALJ's analysis does not end there. Instead, the Regulations create a further mandatory task for the ALJ:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable [data] . . . or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected. . .

Social Security Ruling 96-2p, 1996 WL 374188, at *4. The Regulations require the ALJ to continue evaluating the treating source's opinions by considering "a host of other factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242; *Wilson*, 378 F.2d at 544.

"[I]n all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician [or psychologist] is entitled to great deference, its non-controlling status notwithstanding." *Rogers*, 486 F.3d at 242.

2.      *Non-Treating Medical Sources*

The Commissioner views non-treating medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p, 1996 WL 374180, at *2. Yet the Regulations do not permit an ALJ to automatically accept (or reject) the opinions of a non-treating medical source. *See id.*, at *2-*3. The Regulations explain, "In deciding whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive." 20 C.F.R. § 404.1527(b). To fulfill this promise, the Regulations require ALJs to evaluate non-treating medical source opinions under the factors set forth in § 404.1527(d) including, at a minium, the factors of supportability, consistency, and specialization. *See* 20 C.F.R. §404.1572(f); *see also* Ruling 96-6p at *2-*3.

**C.     Analysis**

A review of the ALJ's decision indicates that he applied the correct legal criteria in evaluating the medical source opinions of treating Drs. Rubio and Peterangelo, and in concluding that neither opinion was entitled to "controlling" or even "deferential" weight. (Tr. 37). Based upon his assessment of Dr. Rubio's and Dr. Peterangelo's opinions as being both insufficiently supported by objective medical data and inconsistent with other medical opinions of record – a conclusion bolstered by the ALJ's specific reference to inconsistencies "with Dr. Danopulos's findings, . . . the normal pulmonary function studies that show that the claimant's breathing capacities are not substantially limited, [and] the Medical Expert's assessment of the case" – the ALJ properly determined that the

21

treating physician rule did not apply.  (Tr. 37).  *See* 20 C.F.R. § 416.927(d)(2); *Wilson,* 378 F.3d at 544.  He also detailed the lack of "proportionate objective findings" and the presence of other contradictory evidence in the record – "including the expert medical opinion of Dr. Boyce, who had the opportunity to review the entire record" – as reasons for declining to give Dr. Rubio's opinion controlling weight.  (*Id.*).

Having cited the appropriate additional factors to be considered when the treating physician rule does not apply (Tr. 36-37), the ALJ then found that despite Dr. Rubio's identification as a pulmonary specialist, he had provided "no explanation whatsoever for the contradiction between his opinion [that Plaintiff had extreme exertional limitations] and [Plaintiff's] normal pulmonary function study."  (Tr. 38).  ALJ Knapp thus declined to accord Dr. Rubio's opinion even deferential weight, finding that it "lack[ed] appropriate supportability and consistency, and also seem[ed] to reflect someone who is not familiar with standards for disability under the Social Security law."  (*Id.*).  He proceeded to deny Dr. Peterangelo's opinion controlling or deferential weight "for the same reasons."  (*Id.*).  Given that analysis, this Court has no basis to conclude that the ALJ failed to apply the appropriate legal standards to Dr. Rubio's and Dr. Peterangelo's opinions.  *See Wilson,* 378 F.3d at 544.

Turning to the opinions rendered by Plaintiff's subsequent primary care physician, the ALJ found Dr. Sefton's opinion (that Plaintiff was prevented from working less by his physical impairments than by the effect of his psychological ones (*see* Tr. 447-48)) to be similarly unpersuasive.  (Tr. 38).  The ALJ declined to give Dr. Sefton's opinion

controlling weight due to its inconsistency with the opinion of Dr. Schulz, the consultative psychologist who examined Plaintiff on two occasions. (Tr. 38; *see* Tr. 228-33, 458-64). Such inconsistency justified the ALJ's refusal to apply the treating physician rule to Dr. Sefton's opinion. The ALJ then properly considered both that lack of "consistency" and the "specialization" factor as he continued his analysis, *see* 20 C.F.R. § 416.927(d)(2)-(4), noting that Dr. Sefton, a family practitioner, "does not have the credentials to render an opinion that is entitled to any special weight because of his lack of expertise in the area of mental health." (Tr. 38).

Significantly, neither a treating physician's diagnosis nor his or her statement that a claimant is disabled is determinative of the ultimate disability decision under the Social Security Act. *See Landsaw v. Sec'y of Health & Human Servs.,* 803 F.2d 211, 213 (6th Cir. 1986); *see also* 20 C.F.R. § 404.1527(e)(1). This is particularly true where a doctor's conclusory statements "are unsupported by detailed objective criteria and documentation." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530 (6th Cir. 1997) (ALJ has valid reason to reject treating physician's opinion unsupported by detailed clinical, diagnostic evidence in his reports). With no record of mental status evaluations or psychiatric tests conducted by Dr. Sexton to support his opinion, and given additional contrary mental health evidence in the form of reviewing psychologist Dr. Chambly's opinion (*see* Tr. 235-49), the ALJ did not err in declining to give controlling or deferential weight to the opinion of Dr. Sexton.

Having thus discounted the opinions of Plaintiff's treating physicians, the ALJ gave the most weight to and relied primarily on the opinion of the medical expert, Dr. Boyce, in assessing Plaintiff's residual functional capacity. (Tr. 37). The ALJ explained that Dr. Boyce's opinion "is better supported by the greater weight of the evidence," noting that Plaintiff's "[r]ecent pulmonary function studies were normal, and the abnormal studies in the past were only minimally so." (*Id.*).

Consistent with applicable Social Security law, the ALJ then continued to analyze Dr. Boyce's opinions subject to the Social Security Regulations' requirement that ALJs evaluate every medical opinion of record, regardless of its source. *See* 20 C.F.R. § 404.1527(d). As to non-treating medical sources such as medical experts who testify during the administrative hearing, the ALJ must evaluate their medical opinions under the same factors applicable to treating medical sources: supportability, consistency, specialization, and "any other relevant factors." *See* 20 C.F.R. § 416.927(d), (f). By commenting on Dr. Boyce's presumptively superior understanding of the "standards for disability under the Social Security law" due to having "testified for many years as a Medical Expert in Social Security cases" (Tr. 38), the ALJ can be deemed to have alluded to the "specialization" factor. Additionally, the ALJ's reference to recent pulmonary test results (*see* Tr. 37) addressed the "supportability" factor and led to his conclusion that Dr. Boyce's opinion was "better supported by the greater weight of the evidence." (*See id.*).

Plaintiff complains, however, that the ALJ failed to acknowledge that Dr. Boyce's testimony regarding Plaintiff's physical limitations conflicts with all other medical source

opinions in the record. (Doc. #8 at 15-17). Dr. Boyce testified that while Plaintiff's bullous emphysema would support certain atmospheric restrictions, "I don't see a physical limitation based on these studies." (Tr. 500-01). In contrast, Dr. Danopulos, the consultive examiner, indicated that Plaintiff's ability to perform such work-related actives as walking, lifting and carrying was reduced by his mild to moderate emphysema (Tr. 253), and the state agency reviewing physicians, Drs. Villanueva and Torello, indicated that Plaintiff was limited to a light or medium exertional level of work. (Tr. 266-69, 403-08). As discussed *supra*, Plaintiff's treating physicians offered even more restrictive opinions regarding Plaintiff's physical limitations.

Although Plaintiff is correct in recognizing that such inherent conflicts implicate the "consistency" factor, a review of the ALJ's decision confirms that the ALJ adequately articulated his reasons for finding that Dr. Boyce's opinion nonetheless was the most well-supported and persuasive. The ALJ stated as follows:

> According to Dr. Boyce, the improvement shown by the most recent [pulmonary function] study was due to the fact that the claimant had quit working with concrete without a mask, and thereafter his limited pulmonary problem was alleviated.
>
> Although the claimant's condition improved once he got away from concrete dust, he would still be at risk if exposed to certain substances or conditions including a reduction or increase in air pressure, according to Dr. Boyce. The claimant could not constantly or frequently climb stairs, but the test results and his exercise stress testing show that he is capable of occasional stair climbing of stairs [sic]. However, climbing of ladders, ropes, or scaffolds can aggravate an underlying pulmonary problem, so the claimant has been duly restricted from those activities.

25

(Tr. 37-38).

As this excerpt illustrates, ALJ Knapp addressed the "consistency" factor by explaining that Dr. Boyce's opinion could be reconciled with that of the other doctors through consideration of an "other relevant factor" – in this instance, the abatement of Plaintiff's respiratory symptoms after his prolonged absence from concrete work and the attendant exposure to air-borne particulate matter. The record reflects that Dr. Peterangelo's opinion dated back to 2003; Dr. Rubio's opinions were rendered in 2003 and 2004; and Drs. Danopulos, Villanueva and Torello also offered their opinions in 2004. Dr. Boyce, by comparison, was evaluating Plaintiff's physical condition as of 2005, after Plaintiff's lungs had additional time to recover from prolonged exposure to environmental irritants. Indeed, the potential for some recovery was forecast in Plaintiff's pulmonary test results from February 2002, finding a "reversible component" to Plaintiff's "mild obstructive airway disease." (Tr. 295). The relative timeliness of the various physicians' opinions was a reasonable "other relevant factor" for the ALJ to consider in assessing the medical evidence. *See, e.g., Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540 (6th Cir. 2007) (not error to decline to give more dated treating physician's opinion controlling weight over more recent ones). The ALJ did not err in finding Dr. Boyce's opinion to be more credible than opinions rendered at a time when Plaintiff's emphysema symptoms were more pronounced..

Accordingly, Plaintiff's challenge to the ALJ's evaluation of the medical source opinions is not well taken.

**IT THEREFORE IS RECOMMENDED THAT**:

1.      The Commissioner's non-disability finding be AFFIRMED; and,

2.      The case be terminated on the docket of this Court.

November 4, 2009                              _____s/ Sharon L. Ovington_____
                                                              Sharon L. Ovington
                                                              United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

 Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten [10] days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(e), this period is extended to thirteen [13] days (excluding intervening Saturdays, Sundays and legal holidays) because this Report is being served by mail.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within ten [10] days after being served with a copy thereof.

 Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Am,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981).